STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

MANY KENNEDY, NIADRA LEMONS,
ALLISON EASTMAN, ANTOINETTE
DE LA CRUZ, BENITA JOE, and
NICOLE ROMERO,

        Plaintiffs,

vs.                                 No. D-101-CV-2015-00397

SECRETARY OF THE NEW MEXICO
CORRECTIONS DEPARTMENT, GREGG
MARCANTEL; DEPUTY SECRETARY OF
OPERATIONS OF THE NEW MEXICO
CORRECTIONS DEPARTMENT, JOE W.
BOOKER, JR.,; DIRECTOR OF ADULT PRISONS
OF THE NEW MEXICO CORRECTIONS
DEPARTMENT, JERRY ROARK; FORMER
WARDEN JOSEPH GARCIA; FORMER WARDEN
ROBERT STEWART; MAJOR ANDREW SWEENEY;
LIEUTENANT DONALD DAVIS; CORRECTIONS
OFFICER DONALD COHEN; CORRECTIONS
OFFICER JOEL TURNBULL; LIEUTENANT MARK
MASSONG; LIEUTENANT MICHAEL CORMIER;
SERGEANT TONY COEN; CAPTAIN JAMES RIGDON;
CAPTAIN LUIS TELLEZ; CAPTAIN KENNY LANGSTON;
LIEUTENANT TERRY ROMO; STIU CAPTAIN
RICHARD HENDERSON; LIEUTENANT SHELBY MARTIN;
CAPTAIN MIKE SANCHEZ; CORRECTIONS OFFICER
PAUL ARMSTRONG; CORRECTIONS OFFICER
PAUL LOPEZ; LIEUTENANT MATT BACA;
CORRECTIONS OFFICER STEPHEN DEBERRY;
CORRECTIONS OFFICER KYLE MENDOZA; and
CORRECTIONS OFFICER STEPHEN STURGILL,

        Defendants.

## FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

        Progress has eluded the Central New Mexico Correctional Facility (hereinafter

"CNMCF"). Within its walls, female corrections officers are considered lesser than those who

are male, subject to unthinkable and constant sexually based violence and harassment. This violence and harassment is long and well known to facility supervisors and even to high-level New Mexico Corrections Department (hereinafter Corrections Department) officials. Still, those responsible for ensuring a constitutional workplace have refused to protect female employees. What follows are many instances of discrimination and failures to take that discrimination seriously—some actionable, some constituting notice to facility and department supervisors of discrimination on the basis of sex and race and ongoing retaliation for reporting the same. All instances demonstrate the pervasive attitude that female officers are either unwelcome or exist for sexual amusement.

Plaintiffs bring this complaint pursuant to 42 U.S.C. Section 1983 for damages resulting from the deprivation of civil rights inflicted upon them by Defendants. The court has jurisdiction of this action and of the parties as New Mexico district court has original jurisdiction in all matters and causes that are not otherwise excepted in the New Mexico Constitution. N.M. Const. art. VI, § 13. Venue is proper in this judicial district as part of the incident complained of occurred in this district. New Mexico State district courts are courts of general jurisdiction and Plaintiffs' claims are properly before the First Judicial District Court. Venue is proper in Santa Fe County, New Mexico, pursuant to NMSA 1978 Section 38-3-1(A) because Defendants Marcantel and Booker may be found and/or reside in the judicial district.

## PARTIES

1.  Plaintiff Many Kennedy is an individual who is a resident of Valencia County, State of New Mexico. At all times material, Ms. Kennedy was a corrections officer employed by CNMCF, a Corrections Department facility.

2.  Plaintiff Niadra Lemons is an individual who is a resident of Valencia County,

State of New Mexico. At all times material, Ms. Lemons was a corrections officer employed by CNMCF, a Corrections Department facility.

3.     Plaintiff Allison Eastman is an individual who is a resident of Valencia County, State of New Mexico. At all times material, Ms. Eastman was a corrections officer employed by CNMCF, a Corrections Department facility.

4.     Plaintiff Antoinette De la Cruz is an individual who is a resident of Bernalillo County, State of New Mexico. At all times material, Ms. De la Cruz was a corrections officer employed by CNMCF, a Corrections Department facility.

5.     Plaintiff Benita Joe is an individual who is a resident of Bernalillo County, State of New Mexico. At all times material, Ms. Joe was a corrections officer employed by CNMCF, a Corrections Department facility.

6.     Plaintiff Nicole Romero is an individual who is a resident of Bernalillo County, State of New Mexico. At all times material, Ms. Romero was a corrections officer employed by CNMCF, a Corrections Department facility.

7.     Defendant Gregg Marcantel is the Cabinet Secretary of the Corrections Department, which operations are in Santa Fe County.

8.     Defendant Joe W. Booker is the Deputy Cabinet Secretary of Operations of the Corrections Department, which operations are in Santa Fe County.

9.     At all times material to this complaint, Former Warden Joseph Garcia was acting under color of state law and in the course and scope of his employment as warden at CNMCF.

10.    At all times material to this complaint, Former Warden Robert Stewart was acting under color of state law and in the course and scope of his employment as warden at CNMCF.

11.    At all times material to this complaint, Major Andrew Sweeney was acting under

color of state law and in the course and scope of his employment as Chief of Security at CNMCF.

12.   At all times material to this complaint, Lieutenant Donald Davis was acting under color of state law and in the course and scope of his employment at CNMCF.

13.   At all times material to this complaint, Corrections Officer Donald Cohen was acting under color of state law and in the course and scope of his employment at CNMCF.

14.   At all times material to this complaint, Corrections Officer Joel Turnbull was acting under color of state law and in the course and scope of his employment at CNMCF.

15.   At all times material to this complaint, Lieutenant Mark Massong was acting under color of state law and in the course and scope of his employment at CNMCF.

16.   At all times material to this complaint, Lieutenant Michael Cormier was acting under color of state law and in the course and scope of his employment at CNMCF.

17.   At all times material to this complaint, Sergeant Tony Coen was acting under color of state law and in the course and scope of his employment at CNMCF.

18.   At all times material to this complaint, Captain James Rigdon was acting under color of state law and in the course and scope of his employment at CNMCF.

19.   At all times material to this complaint, Captain Luis Tellez was acting under color of state law and in the course and scope of his employment at CNMCF.

20.   At all times material to this complaint, Captain Kenny Langston was acting under color of state law and in the course and scope of his employment at CNMCF.

21.   At all times material to this complaint, Lieutenant Terry Romo was acting under color of state law and in the course and scope of his employment at CNMCF.

22.   At all times material to this complaint, STIU (Security Threat Intelligence Unit)

Captain Richard Henderson was acting under color of state law and in the course and scope of his employment at CNMCF.

23.     At all times material to this complaint, Lieutenant Shelby Martin was acting under color of state law and in the course and scope of his employment at CNMCF.

24.     At all times material to this complaint, Captain Mike Sanchez was acting under color of state law and in the course and scope of his employment at CNMCF.

25.     At all times material to this complaint, Corrections Officer Paul Armstrong was acting under color of state law and in the course and scope of his employment at CNMCF.

26.     At all times material to this complaint, Corrections Officer Paul Lopez was acting under color of state law and in the course and scope of his employment at CNMCF.

27.     At all times material to this complaint, Lieutenant Matt Baca was acting under color of state law and in the course and scope of his employment at CNMCF.

28.     At all times material to this complaint, Corrections Officer Stephen DeBerry was acting under color of state law and in the course and scope of his employment at CNMCF.

29.     At all times material to this complaint, Corrections Officer Kyle Mendoza was acting under color of state law and in the course and scope of his employment at CNMCF.

30.     At all times material to this complaint, Corrections Officer Stephen Sturgill was acting under color of state law and in the course and scope of his employment at CNMCF.

## OVERVIEW OF SUPERVISORY DEFENDANTS

31.     This complaint details a variety of incidents over an extended period of time. By way of report, observation, and participation, many policy makers and/or supervisors within CNMCF and the Corrections Department knew of the conduct complained of herein and were responsible for either reporting the conduct to parties who could discipline officers who had

sexually harassed or unlawfully discriminated against fellow officers; disciplining officers themselves; investigating what was an obviously hyper-sexualized workplace; setting policy to prevent sexual harassment, unlawful discrimination, and retaliation for reporting the same; and/or providing training to prevent future misconduct.

32.     By abrogating their responsibilities to Plaintiffs, and in some instances participating directly in the sexual misconduct/discrimination and retaliation, Supervisory Defendants—Secretary of Corrections, Marcantel; Deputy Director of Corrections, Booker; Director of Adult Prisons, Roark; Former CNMCF Warden, Garcia; now Former CNMCF Warden Stewart; Major Sweeney; Captains Henderson, Tellez, Rigdon, Langston and Sanchez; Lieutenants Baca, Cormier, Davis, Martin, Massong, and Romo; and Sergeant Coen (hereinafter "Supervisory Defendants")—either supervised Plaintiffs unconstitutionally or adopted an unlawful policy of discrimination against, and the accepted sexual harassment of, female officers, including Plaintiffs, at CNMCF, and retaliation for reporting the same.

33.     All Supervisory Defendants have a responsibility to stop unlawful discrimination and sexual harassment whether it is known to them through report or observation.

34.     All Supervisory Defendants have a responsibility to prevent retaliation against anyone who has reported sexual harassment or unlawful discrimination whether it is known to them through report or observation.

35.     Supervisory Defendants observed serious sexual harassment and unlawful discrimination at CNMCF and retaliation for reporting the same, but did nothing to prevent additional constitutional violations.

36.     In addition to failing to prevent serious sexual harassment and unlawful discrimination at CNMCF, Supervisory Defendants—Captain Sanchez; Lieutenants Baca,

Cormier, Davis, Martin, Massong, and Romo; and Sergeant Coen—sexually harassed Plaintiffs, discriminated against them, and/or retaliated against Plaintiffs for reporting the same.

37.     Defendant Marcantel is the Secretary of the Corrections Department:

    a.     He was appointed in November 2011.

    b.     He is responsible for hiring and terminating Corrections Department facility wardens, including CNMCF wardens, and Corrections Department administrative staff. He further approves transfers within the Corrections Department.

    c.     He is also responsible for setting Corrections Department policy— including policies related to sexual harassment and discrimination, reporting, oversight, discipline, retention, and retaliation—and preventing sexual harassment and discrimination and retaliation for reporting the same.

    d.     He further ensures that Corrections Department employees are properly trained and supervised.

    e.     In addition to his policy-making responsibilities, as detailed below, Defendant Marcantel actually fielded a complaint about sexual harassment and discrimination at CNMCF and did nothing in response.  (See ¶¶ 113-117; 347-356; 409-412.)

    f.     Defendant Marcantel's failure to fulfill his policy-making responsibilities and to act on observation and reports of sexual harassment, unlawful discrimination, and retaliation for reporting the same impacted all of the Plaintiffs.

38.     Defendant Booker is the Deputy Secretary of the Corrections Department:

    a.     He was appointed to the Corrections Department in May 2012.

    b.     He is responsible for hiring and terminating Corrections Department

facility wardens, including CNMCF wardens, and Corrections Department administrative staff.

     c.     He is responsible for setting Corrections Department policy—including policies related to sexual harassment and discrimination, reporting, oversight, discipline, retention, and retaliation—and preventing sexual harassment and discrimination and retaliation for reporting the same.

     d.     He is further charged with ensuring that Corrections Department employees are properly trained and supervised.

     e.     In addition to his policy-making responsibilities, as detailed below, Defendant Booker actually fielded a complaint about sexual harassment and discrimination at CNMCF and did nothing in response. (See ¶¶ 113-117; 347-356; 409-412.)

     f.     Defendant Booker's failures to fulfil his policy-making responsibilities and to act on observation and reports of unlawful discrimination, sexual harassment, and retaliation for reporting the same impacted all of the Plaintiffs.

39.     Defendant Roark is the Director of Adult Prisons:

     a.     He has been in that position since Fall of 2011.

     b.     He is responsible for hiring and terminating Corrections Department facility wardens, including CNMCF wardens, and Corrections Department administrative staff.

     c.     He is responsible for setting Corrections Department policy—including policies related to sexual harassment and discrimination, reporting, oversight, discipline, retention, and retaliation—and preventing sexual harassment and discrimination and

retaliation for reporting the same.

d.     He is further charged with ensuring that Corrections Department employees are properly trained and supervised. In addition to his policy-making responsibilities, as detailed below, Defendant Roark actually fielded a complaint about a significant incident of sexual harassment and did nothing in response. (See ¶¶ 210-215.)

e.     Defendant Roark supervised all of the Plaintiffs.

f.     Defendant Roark's failures to fulfill his policy-making responsibilities and to act on observation and reports of unlawful discrimination and sexual harassment impacted all of the Plaintiffs.

40.     Defendant Garcia is a former warden of CNMCF:

a.     He was the CNMCF Warden from October 28, 2011, through the beginning of calendar year 2014. Prior to being the warden, he was the Deputy Warden at CNMCF from 2004.

b.     He had the authority to terminate and/or discipline CNMCF employees.

c.     He is responsible for setting CNMCF policy—including policies related to sexual harassment and discrimination, reporting, oversight, discipline, retention, and retaliation—and preventing sexual harassment and discrimination and retaliation for reporting the same.

d.     He was further charged with ensuring Corrections Department employees were properly trained and supervised.

e.     In addition to his policy-making responsibilities, as detailed below, Defendant Garcia fielded multiple complaints concerning significant incidents of sexual harassment and unlawful discrimination and did nothing in response. (See ¶¶ 175-179,

183-189, 306-316, 486-537, 587-605, 707-733.)

      f.      Defendant Garcia supervised all of the Plaintiffs.

      g.      Defendant Garcia's failure to fulfill his policy-making responsibilities and to act on observation and reports of unlawful discrimination and sexual harassment impacted all of the Plaintiffs.

41.     Defendant Stewart is the former warden of CNMCF:

      a.      On information and belief, he resigned after the Plaintiffs filed the initial complaint in this case and the Corrections Department placed him on administrative leave.

      b.      He was hired as Warden at WNMCF on October 28, 2011 and became the Warden at CNMCF in July, 2012.

      c.      He had the authority to terminate and/or discipline CNMCF employees.

      d.      He is responsible for setting CNMCF policy—including policies related to sexual harassment and discrimination, reporting, oversight, discipline, retention, and retaliation—and preventing sexual harassment and discrimination and retaliation for reporting the same.

      e.      He was further charged with ensuring that CNMCF employees were properly trained and supervised.

      f.      In addition to his policy-making responsibilities, as detailed below, Defendant Stewart fielded multiple complaints concerning significant incidents of sexual harassment and unlawful discrimination and did nothing in response. (See ¶¶ 72-74, 254-275, 376-432.)

      g.      Defendant Stewart supervised all of the Plaintiffs.

h.      Defendant Stewart's failure to fulfill his policy-making responsibilities and to act on observation and reports of unlawful discrimination and sexual harassment impacted all of the Plaintiffs.

42.     Defendant Sweeney is a Major at CNMCF.

a.      He has been in that position since July 24, 2010.

b.      Majors supervise over 200 employees, including each Plaintiff.

c.      He is responsible for ensuring the employees that he supervises do not sexually harass or discriminate against one another, fielding sexual harassment and discrimination claims, and disciplining employees who he has determined have sexually harassed and/or discriminated against their female counterparts.

d.      In addition, as detailed below, Defendant Sweeney observed discrimination at CNMCF and fielded multiple complaints concerning significant incidents of sexual harassment and unlawful discrimination and did nothing in response. (See ¶¶ 165-194, 306-333, 376-400, 439-471, 486-537, 707-733.)

e.      Defendant Sweeney supervised all of the Plaintiffs.

43.     Defendants Henderson, Tellez, Rigdon, Langston and Sanchez are captains at CNMCF.

a.      Defendant Henderson has been in that position since before 2007.

b.      Defendant Tellez has been in that position since before 2007.

c.      Defendant Rigdon has been in that position since around 2012. He has also been the acting Chief of Security since about 2014.

d.      Defendant Langston has been in that position since before 2007.

e.      Defendant Sanchez has been in that position since before 2007.

f.      Captains can supervise 60 employees on a shift and are responsible for fielding complaints regarding sexual harassment and discrimination and acting to prevent the same.

g.      Defendant Henderson observed discrimination at CNMCF and fielded multiple complaints concerning significant incidents of sexual harassment and unlawful discrimination and did nothing in response. (See ¶¶ 210-215, 477-485.)

h.      Defendant Tellez observed discrimination and fielded a complaint concerning significant incidents of sexual harassment and unlawful discrimination and did nothing in response. (See ¶¶ 210-215.)

i.      Defendant Rigdon discriminated against Ms. De la Cruz on the basis of her sex.

j.      Defendant Sanchez observed discrimination at CNMCF, fielded a report of retaliation, and himself sexually harassed and discriminated against Plaintiff Romero. (See ¶¶ 210-221, 305, 439-470.)

k.      Defendants Henderson, Tellez, and Sanchez supervised all of the Plaintiffs.

44.     Defendants Baca, Cormier, Davis, Martin, Massong, and Romo are all Lieutenants at CNMCF.

a.      Defendant Baca has been in that position since about 2013.

b.      Defendant Cormier was in that position since 2012 until he stepped down in 2013.

c.      Defendant Davis has been in that position since Summer of 2011.

d.      Defendant Martin has been in that position since July 25, 2009.

e. Defendant Massong has been in that position since 2011 or 2012.

f. Defendant Romo has been in that position since before 2007.

g. Lieutenants supervise 30 or more employees and are responsible for fielding complaints regarding sexual harassment and unlawful discrimination and acting to prevent the same when they receive a report, including disciplining offending officers.

h. If they observe sexual harassment or unlawful discrimination, as supervisors, they must act to prevent it as well.

i. Lieutenants must also not themselves sexually harass or unlawfully discriminate against their subordinates or retaliate against them for reporting the same.

j. Defendant Baca supervised all Plaintiffs except Plaintiff Romero and ignored reports of sexual harassment and unlawful discrimination. (See ¶¶ 240-253.)

k. Defendant Cormier supervised Plaintiffs. He observed a significant instance of discrimination on the basis of sex and did nothing in response. (See ¶¶ 376-391.)

l. Defendant Davis supervised Plaintiffs. He discriminated against some of the Plaintiffs on the basis of their sex and retaliated against them for reporting the same. (See ¶¶ 148-153, 376-432, 750-752, 754-759, 849-860.)

m. Defendant Martin supervised Plaintiffs. Defendant Martin severely sexually harassed some of the Plaintiffs. (See ¶¶ 210-221, 306-316, 486-537.)

n. Defendant Massong supervised Plaintiffs. Defendant Massong discriminated against some of the Plaintiffs on the basis of their sex. (See ¶¶ 357-362, 792-795, 797-801.)

o. Defendant Romo supervised Plaintiffs. Defendant Romo fielded a report

of very serious sexual harassment and did nothing in response. (See ¶¶ 210-215.)

45. Defendant Coen is a Sergeant at CNMCF.

    a. Defendant Coen has been in that position since about 2013.

    b. Sergeants supervise 4 or more employees and are responsible for fielding complaints regarding sexual harassment and unlawful discrimination and acting to prevent the same when they receive a report, including disciplining offending officers.

    c. If they observe sexual harassment or unlawful discrimination, as supervisors, they must act to prevent it as well.

    d. Sergeants must also not themselves sexually harass or unlawfully discriminate against their subordinates or retaliate against them for reporting the same.

    e. Upon information and belief, Sergeant Coen will be promoted to Lieutenant after completion of an investigation where he misplaced an inmate for several days.

    f. Defendant Coen discriminated against some of the Plaintiffs on the basis of their sex and retaliated against them for reporting the same. (See ¶¶ 363-375, 862-868.)

46. Supervisory Defendants participated in, ratified, or unlawfully ignored unconstitutional conduct that created an ongoing pattern and practice of discriminatory conduct and a hostile working environment.

<strong><u>OVERVIEW OF NON-SUPERVISORY DEFENDANTS</u></strong>

47. Corrections Officers Armstrong, Cohen, DeBerry, Lopez, Mendoza, Sturgill, and Turnbull all sexually harassed and/or unlawfully discriminated against Plaintiffs Kennedy, and/or Lemons and/or retaliated against them for reporting the same.

48.    Corrections Officers Armstrong, Cohen, DeBerry, Lopez, Mendoza, Sturgill, and Turnbull's acts all provided notice to Supervisory Defendants that there was rampant discrimination and retaliation for reporting the same at CNMCF.

### HISTORY OF SEXUAL MISCONDUCT AND HARASSMENT AT CNMCF

49.    Corrections Department Defendants—Marcantel, Booker, and Roark—and CNMCF Supervisory Defendants have long endorsed a physically violent and sexually abusive culture.

50.    CNMCF's violent, sexual culture has unsurprisingly resulted in a long history of sexual misconduct at the facility.

51.    Almost uniformly, however, the Corrections Department Supervisory Defendants, specifically Corrections Department Defendants—Marcantel, Booker, and Roark—have not disciplined or removed CNMCF supervisors and management involved in the allegations from their positions.

52.    In some instances, the Corrections Department Defendants have simply taken alleged perpetrators of sexual harassment and physical assault out of the facility, placing them in other facilities, or even promoted offending employees within the Corrections Department.

53.    Including, but not limited to, in 2009 and 2010, then Warden Anthony Romero instituted a disciplinary technique called "nuts to butts," despite concerns of inmate on inmate sexual assault.

54.    Under this highly unusual and inhumane disciplinary technique, CNMCF staff forced inmates to strip to their underwear and sit on the ground front to back, straddling one another so that the "nuts" of one inmate were pressed against the "butts" of the inmate in front of them.

55.     While implementing "nuts to butts," corrections officers concealed their identities with face masks and threatened inmates with guns and attack dogs if they did not comply.

56.     The officers held inmates in this position for hours without access to a bathroom, water, or food.

57.     During one such incident, an inmate urinated on the inmate in front of him, leaving a pool of urine in which several other inmates had to sit.

58.     Directly participating in the degradation, Warden Romero called the inmates "bitches" while forcing the inmates to sit in the compromised position.

59.     The use of such a technique was not based in prison training or policies.

60.     CNMCF management and staff employed the tactic to intimidate and sexually humiliate inmates.

61.     Then Corrections Emergency Response Team (CERT) Lieutenant Joe Lytle implemented "nuts to butts" under the direction and supervision of then Warden Anthony Romero.

62.     A class of inmates named both men as defendants in a lawsuit regarding the use of this technique.

63.     Upon information and belief, Warden Romero and Lieutenant Lytle, among other named defendants, settled the lawsuit for $750,000.

64.     The Corrections Department has since banned this technique from use in any Corrections Department facility.

65.     Still, since the inmates exposed this abusive practice, the Corrections Department promoted former Warden Romero to his current position as Deputy Director of Adult Prisons for the Corrections Department.

66.     The Corrections Department also promoted former CERT Lieutenant Lytle to Deputy Warden at the Southern New Mexico Corrections Facility following the incident.

67.     Additionally, in May 2012, a former corrections officer at CNMCF exposed previously reported and ignored incidents of corrections officers raping inmates at the facility.

68.     The former officer alleged that several officers at CNMCF had forced prisoners to have sex with them and that the warden, deputy wardens, and other top-level prison officials at the facility knew of the rapes and sexual abuse, but did nothing to stop them or to discipline the offending officers.

69.     One CNMCF inmate filed civil charges against Captain Kenneth Carrejo, alleging that Captain Carrejo had both orally and anally raped him.

70.     Former Warden Romero, since promoted by Corrections Department Defendants, was also the acting warden at the time of this incident.

71.     Upon information and belief, that lawsuit has also settled, and felony charges of criminal sexual penetration of an inmate are currently pending against Captain Carrejo.

72.     Next, upon information and belief, approximately three (3) years ago, female staff members accused then Deputy Warden Ken Sandlin of sending sexually explicit emails to them.

73.     These women complained about these unsolicited emails that violated prison policy, but rather than facing any disciplinary action, Deputy Warden Sandlin was simply moved to a different unit.

74.     Approximately, a year later, the Corrections Department Defendants and Warden Stewart finally fired Deputy Warden Sandlin for giving a high-profile inmate special treatment, not for any of his alleged sexual misconduct.

75.     CNMCF Supervisory Defendants and Corrections Department Defendants were

aware of the above incidents and other incidents.

76.ᵉ    Each of the above described incidents should have independently given cause for CNMCF Supervisory Defendants and Corrections Department Defendants to scrutinize facility operations.

77.    Instead, those charged with ensuring a safe, constitutional work environment did nothing to protect CNMCF employees, specifically female CNMCF employees.

## COMMON ALLEGATIONS

78.    The culture of physical aggression and open, ratified sexual misconduct at CNMCF permeates the facility, from the treatment of inmates to the treatment of female employees, including Plaintiffs.

79.    The sexualized, violent environment within CNMCF is a threat to both inmates and female employees, including Plaintiffs, and non-supervisory and Supervisory Defendants' actions and failures to act are directly responsible for this intolerable atmosphere.

80.    Each Plaintiff has served or serves New Mexico as a corrections officer at CNMCF. Three of the six Plaintiffs are currently working at the facility.

81.    Female correctional officers, including Plaintiffs, face a greater threat to their personal safety from their fellow correctional officers and supervisors than from the inmates.

82.    Plaintiffs' common allegations, as well as their individual experiences, demonstrate the unlawful sexualized environment ignored by CNMCF Supervisory Defendants and Corrections Department Defendants.

83.    CNMCF non-supervisory and Supervisory Defendants have subjected Plaintiffs to pervasive discrimination and harassment.

84.    At every level, CNMCF is designed to accommodate male, but not female,

officers.

85.     At CNMCF, male officers have frequently degraded and screamed at female officers, including Plaintiffs, in front of both inmates and supervisors.

86.     Male officers do not scream at, nor degrade, their male counterparts in the same manner.

87.     Further, the male officers have frequently and openly discussed sexual conquests in front of Plaintiffs, inmates, and supervisors. But the discrimination against women extends to even the most basic aspects of the job.

88.     Up until the time there was media coverage regarding Plaintiffs' first complaint filed in this case, though plainly noticeable to CNMCF Supervisory Defendants, the control center toilet was situated such that men could turn their backs and urinate in front of inmates without the inmates seeing their genitalia.

89.     A woman, however, had to expose herself to the inmates if she wanted to use the toilet in the control center.

90.     Additionally, in or about August 2012 and again in December 2012, CNMCF supervisors required Plaintiffs to be fitted for special female vests.

91.     The fittings were highly invasive.

92.     Each Plaintiff had her breasts fondled and her nipples measured as part of the process.

93.     Two of the Plaintiffs underwent this highly invasive fitting in front of inmates.

94.     Despite each Plaintiff having been subjected to this highly invasive fitting twice, CNMCF supervisors did not ultimately provide female employees with vests fitted for the female form.

95. CNMCF forced Plaintiffs to wear vests that were meant for men and that did not accommodate a woman's body.

96. Plaintiffs experienced ongoing pain and discomfort as a result of the male vests CNMCF management forced them to wear.

97. Further, up until there was media coverage regarding Plaintiffs' first complaint filed in this case, and though plainly visible to staff and CNMCF Supervisory Defendants for years, there were sexually explicit notes, drawings, even effigies throughout the facility.

98. It is unclear who wrote the notes, drew the drawings, or placed the effigies, but Plaintiffs found the drawings, notes, and effigies in areas only accessible to CNMCF employees; and, because they were conspicuously placed, CNMCF Supervisory Defendants were well aware of the sexually explicit material littering the facility.

99. Over the radio, too, the male officers use sexually explicit language about women, sometimes specifically addressing their female counterparts directly.

100. CNMCF Supervisory Defendants overheard officers using inappropriate and sexually explicit language over the radio and did nothing in response.

101. The pervasive hostility toward women has also been apparent to CNMCF Supervisory Defendants from the attitudes demonstrated and comments made by the male officers about female officers during yearly trainings.

102. On the first day of yearly trainings, male officers count the number of female officers in the training and make derogatory comments about their female co-workers in front of both supervisors and the women they insult.

103. Male officers' derogatory comments include but are not limited to statements like:

    a. "Fuck, we have a female in the class. She's going to hold us up on the range and we'll be there all fucking day."

b.    "Fuck, I don't know why women join any law enforcement jobs because they can't even do the job." or;

c.    "Women shouldn't be in Corrections, they need to stay home and take care of the house. That's where they belong."

104.    Everyone, including CNMCF Supervisory Defendants, hears these degrading comments, but no one intervenes, and the lack of intervention allows the discriminatory culture to perpetuate and serves to embolden offending officers.

105.    The degradation of women at CNMCF is not limited to male officers' discriminatory and ignorant attitudes regarding their ability to perform their jobs, but extends even to the glorification of violence against women as well.

106.    The domestic violence and sexual harassment training at CNMCF actually encourages hostility towards women instead of ameliorating it.

107.    During the yearly domestic violence and sexual harassment training that all officers must attend, male officers make statements that dehumanize their female counterparts and celebrate violence against women.

108.    In domestic violence training, both instructors and male officers alike make comments that include, but are not limited to, the following: "The bitch deserves to get an ass-kicking;" "My money, my rules. If the bitch doesn't like it, then she can leave;" or the male officers will just shout out, "Dumb bitch!"

109.    Many of the female officers, including some of the Plaintiffs, have been victims of domestic violence in the past. Hearing these comments, especially in a domestic violence "training," is extremely upsetting for them.

110.    Female officers do not feel comfortable speaking out about the male officers' inflammatory statements in these trainings because they fear they will be mocked and/or

retaliated against.

111.    Indeed, generally, CNMCF female employees face unceasing fear of retribution and retaliation if they speak up about their experiences of sexual harassment.

112.    Still, some women have boldly spoken out, including Plaintiffs.

113.    In a town hall meeting in or about December 2013 with Defendants Marcantel and Booker present, Ms. Lemons spoke to the Secretary and Deputy Secretary in part about her personal experiences at CNCMF, but also the sexually hostile work environment and discrimination that all women were subject to on a daily basis at CNMCF.

114.    Defendants Marcantel and Booker asked Ms. Lemons to send them documentation to review.

115.    Ms. Lemons sent Defendant Booker several documents illustrating the rampant sexual harassment at CNMCF suffered by all female employees, including her own experiences.

116.    Ms. Lemons understood that Defendant Booker was then going to forward the information to Defendant Marcantel.

117.    To Ms. Lemons' knowledge, no one investigated or followed up on her complaint.

118.    CNMCF and Corrections Department Supervisory Defendants are all responsible for implementing policy and practice to prevent discrimination within CNMCF.

119.    When CNMCF and Corrections Department Supervisory Defendants receive a complaint regarding discrimination or observe discrimination first hand, they have a duty to investigate, punish the perpetrator, if warranted, and, if necessary, take steps to prevent future discrimination.

120.    CNMCF and Corrections Department Supervisory Defendants have both

discriminated against Plaintiffs and failed to protect Plaintiffs.

121.    CNMCF Supervisory Defendants ignored Plaintiffs' complaints of sexual harassment and made clear that at CNMCF any sexual misconduct and/or discrimination will be accepted, as "boys will be boys."

122.    From CNMCF management to the Cabinet Secretary of Corrections, every level of the Corrections Department supervision is aware of the sexually and physically hostile environment towards women at CNMCF. They have failed to address the harassment and discrimination against female employees at CNMCF, which further emboldens male employees, putting female officers' safety at risk and creating a hostile and threatening daily work environment.

123.    The protection of male officers, even in the face of unrefuted evidence of harassment, is commonplace at the facility.

124.    Rather than facing termination, male officers are given the option to either resign so that they may be employed by another corrections facility, or take early retirement.

125.    The clear message to the female employees is that no matter how egregiously male officers behave, the Corrections Department will protect the males over the female officers who are subjected to their unlawful behavior.

126.    Although the Plaintiffs have all experienced the overall sexual and physical hostility that permeates CNMCF, which in and of itself constitutes a violation of each women's civil rights, Plaintiffs have also experienced individual, directed instances of sexual hostility.

127.    Each individual instance of directed discrimination provided CNMCF with even more notice of the unconscionable actions of its employees and opportunity to intervene; still, Supervisory Defendants, Corrections Department and CNMCF alike, failed to act and in so

doing promoted the continuation of the pervasive discrimination of women in the facility.

## INDIVIDUAL FACTUAL ALLEGATIONS

*The following paragraphs detail Plaintiff-specific facts that 1) give rise to individual claims for unlawful discrimination and/or retaliation for reporting the same; 2) should have provided notice to Supervisory Defendants that there is an ongoing hostile work environment at CNMCF; 3) or both.*

### I.    Plaintiff Many Kennedy.

128.    In the over five (5) years that Ms. Kennedy has worked as a corrections officer at CNMCF, she has been subjected to constant verbal harassment and physical aggression as a result of her sex and national origin (Thai).

129.    Ms. Kennedy repeatedly reported the harassment and aggression; and, Supervisory Defendants repeatedly witnessed the same.

130.    Despite having witnessed harassment themselves and/or having received Ms. Kennedy's numerous complaints, CNMCF Supervisory Defendants did not discipline offending officers. Their failure to discipline ratified and encouraged the antagonistic and hostile environment to which Ms. Kennedy has been, and continues to be, subjected.

131.    Instead of taking disciplinary action against the offending officers, Ms. Kennedy's supervisors told her to play along with the sexual behavior and try to "be one of the boys."

132.    Regularly, male officers degraded Ms. Kennedy, making comments to her that include, but are not limited to: "Why are you so stupid, you stupid bitch? You can't even do the count, you stupid fucking bitch;" "How do you wipe your pussy? From the front to the back or the back to the front;" "Get the fuck out of here, bitch;" "Many, if you didn't have your husband, I would get you."

133.    Ms. Kennedy attended her most recent "domestic violence and sexual harassment class"—as required for all CNMCF employees, including CNMCF Supervisory Defendants—on

or about August 2014.

134.   As alleged above, this course is not a substantive sexual harassment or domestic violence class and is typically just an opportunity for the male officers to further harass female officers.

135.   During that class, the instructor's comments to the class included, but were not limited to, "Well, if the woman goes back to an abuser, maybe she likes the abuse;" or, "maybe [the woman] deserves it."

136.   This type of commentary from the instructor of a class designed to address the very serious problem of domestic violence contributes to and encourages violence and disrespect toward women, including Ms. Kennedy, in the workplace at CNMCF.

137.   As they attend the training as well, CNMCF Supervisory Defendants are aware of the discriminatory content of the training classes and allow the demeaning verbal abuse to continue.

138.   Up until there was media coverage regarding Plaintiffs' first complaint filed in this case, and though plainly visible to staff and CNMCF Supervisory Defendants, there was a sexually graphic depiction of Ms. Kennedy among the multiple sexually graphic images of women located throughout CNMCF.

139.   The drawing was labeled with Ms. Kennedy's first name "Many," thereby clearly identifying Ms. Kennedy as the object in the drawings.

140.   The drawing of Ms. Kennedy was located in an area where inmates do not have access.

141.   The picture depicted a woman bending over with exposed breasts sucking on a penis.

142.     Underneath the woman, someone drew Ms. Kennedy's face with devil horns.

143.     The drawings had been in plain sight for years.

144.     Though in plain sight, CNMCF Supervisory Defendants did nothing to address the sexually explicit and degrading images of one of their employees until Plaintiffs filed their first complaint in this matter.

145.     And, although CNMCF Supervisory Defendants attempted to paint over the image of Ms. Kennedy, it is still discernable.

146.     Male officers have also jeopardized Ms. Kennedy's safety, leaving Ms. Kennedy locked in holding spaces with several inmates for an unreasonable and unsafe amount of time.

147.     The male officers only left female officers in this manner, and CNMCF Supervisory Defendants are well aware of where their officers are in the facility at any given moment.

148.     On or about March 5, 2012, after Ms. Kennedy completed rounds in one of the inmate pods and told the inmates to make their beds and clean their cells pursuant to prison policy, Defendant Davis came through immediately afterward and told the inmates that they did not have to listen to her because she "was just a woman."

149.     Inmates informed Ms. Kennedy that Defendant Davis also told them not to listen to her because she "was a dumb female."

150.     Encouraging insubordination of the inmates threatens both the authority of Ms. Kennedy's position as a corrections officer and her physical safety.

151.     On October 26, 2014, Ms. Kennedy called Ronald Perez and could hear Officer Robert Darnell, the union representative, making sex noises in the background.

152.     On November 2, 2014, Ms. Kennedy called Ronald Perez again and again she

heard Robert Darnell making sex noises in the background.

153.   Further, on January 12, 2015, Defendant Davis made a choking gesture directed at Ms. Kennedy while she was signing into work.

### *Facts Related to Defendant DeBerry and Supervisory Defendants for Count I: Fourteenth Amendment Violation of Substantive Due Process and Equal Protection*

154.   Ms. Kennedy has long received sexually threatening phone calls when she works the graveyard shift.

155.   Ms. Kennedy has regularly complained to her supervisors about these and other calls, but her supervisors either downplayed or totally ignored those complaints, and she has suffered retaliation and increased aggression towards her as a result.

156.   The sexually explicit and threatening phone calls are sometimes so frequent that Ms. Kennedy has had to unplug her phone during her shift to escape the sexual threats and comments.

157.   When Ms. Kennedy has been unable to use the phone during her shift, she is less available to her supervisors and her personal safety would be in jeopardy if an emergency situation were to arise.

158.   Additionally upsetting, the callers targeted Ms. Kennedy when she was working graveyard shift, alone and at night.

159.   These phone calls include but are not limited to:

   a.     On December 15, 2008, at 10:50 p.m., Correctional Officer Anthony Alfero called Ms. Kennedy and said "Come on baby talk dirty, make me hot, make me hard" while breathing heavily.

   b.     On December 26, 2008, at 11:50 p.m., Officer Ray Salazar called Ms. Kennedy and told her she was good looking and that he hoped to have a relationship with her.  Later, he came to control and grabbed Ms. Kennedy's hand and kissed it twice.

c. On May 27, 2009, at 11:00 p.m., an unidentified male called Ms. Kennedy and said, "You stupid ugly fucking bitch," and then hung up on her.

d. On July 26, 2009, an unidentified male called Ms. Kennedy and said, "Suck my dick."

e. On September 14, 2009, at 11:50 p.m., an unidentified female called Ms. Kennedy and said "You fucking bitch, you fucking ugly fucking bitch."

f. On May 29 2010, at 10:15 p.m., an unidentified male called Ms. Kennedy and said "Bitch you want to get fucked."

g. On September 5, 2010, at 11:50 p.m., an unidentified male called Ms. Kennedy while she was the control officer and said "You want to fuck?"

h. On January 10, 2011, at 11:40 p.m., an unidentified male called Ms. Kennedy while she was the control officer and said "Fuck you bitch, you want to suck my dick?"

i. On April 21, 2011, at 11:45 p.m., an unidentified male called Ms. Kennedy while she was the control officer and said "Want to suck my dick, come on bitch, suck my dick, you're horny and want to suck my dick".

j. On February 21, 2012, at 2:40 a.m., an unidentified male called Ms. Kennedy and said, "Suck my dick."

k. On November 26, 2014, at 5:32 p.m., an unidentified male called Ms. Kennedy while she was the control officer and said "I want to hammer you, bitch."

l. In January 2015, an unidentified male called Ms. Kennedy while she was the control officer and said, "Drop your pants. I want to fuck you."

160. In April 2011, after receiving a particularly explicit phone call late at night, Ms. Kennedy went to the security unit the next morning to speak to Defendant DeBerry, who monitors facility phone calls.

161. Ms. Kennedy told Defendant DeBerry about the call the night before and about the many other calls she had received.

162. Ms. Kennedy asked for his help in finding out who was making the calls so that she could report that person specifically and put an end to the calls.

163.    Instead of helping, Defendant DeBerry told her that finding out who made the calls would be too time consuming and "by the time we figure it out, you'll be over it, so why don't you just say to them: 'How big is it?'" referring to the size of the caller's penis.

164.    By ignoring Ms. Kennedy's complaints about the calls, Defendant DeBerry emboldened other officers to call and sexually threaten Ms. Kennedy.

### Defendants Sturgill, and Supervisory Defendants for Count V: First Amendment Retaliation and for acts providing notice for the basis of Counts II, III, and IV.

165.    On or about July 9, 2010, Defendant Sturgill forced Ms. Kennedy to watch a pornographic movie on his cell phone.

166.    On or about September 13, 2010, Defendant Sturgill left fecal matter and urine in the toilet bowl that is located in the same area where Ms. Kennedy worked.

167.    Ms. Kennedy asked Defendant Sturgill to flush it, and he refused, pointing his finger in Ms. Kennedy's face and telling her to "shut the fuck up" and "no one wants to hear you, bitch."

168.    Defendant Sturgill yelled at Ms. Kennedy several times at the top of his lungs.

169.    On one occasion, Ms. Kennedy turned on her radio so that others could hear Defendant Sturgill screaming profanities at her.

170.    After Ms. Kennedy broadcasted Sturgill's verbal abuse, Defendant Langston paged Defendant Sturgill and told him to report to master control.

171.    Additionally, Ms. Kennedy submitted a written complaint to Defendant Langston on September 14, 2010, about this incident, but did not receive a response.

172.    On September 18, 2010, Sturgill called Ms. Kennedy a "fucking bitch" and threw sand at her car while she drove past him.

173.    On September 20, 2010, someone scratched Ms. Kennedy's car on the right back

passenger side.

174. On September 21, 2010, Sturgill stood in front of a building and pretended that he was going to hit Ms. Kennedy with his motorcycle helmet.

175. On or about September 22, 2010, Ms. Kennedy went to Defendant Sweeney, then Chief of Security, with Sergeant Jonene Owens, to talk about the continued harassment by Defendant Sturgill.

176. Ms. Kennedy also told Defendant Sweeney that Defendant Sturgill had destroyed some of the property at her post during Ms. Kennedy's day off, including bowls, spoons, and cleaning supplies.

177. On or about October 23, 2010, Ms. Kennedy sent another written complaint about Defendant Sturgill to Defendant Garcia. At that time, Defendant Garcia was Deputy Warden of CNMCF.

178. In that memorandum, Ms. Kennedy summarized to Defendant Garcia that Defendant Sturgill had stared at her in a threatening manner, called her a "piece of shit," and kicked towards her as if he wanted to physically harm her.

179. Although Ms. Kennedy did finally received a response to the memorandum from Defendant Garcia, no supervisor or CNMCF administrator disciplined, or adequately disciplined, Defendant Sturgill, as his behavior did not change.

180. On or about December 26, 2010, Ms. Kennedy filed an additional Security Memorandum with CNMCF supervisory personnel informing them that even after she filed complaints about Defendant Sturgill, he continued to create a hostile work environment.

181. Ms. Kennedy repeatedly asked within that Security Memorandum, and otherwise, to not be assigned to work stations that put her into contact with him, but management did not